UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 1:15cv14174-NMG

CARLA SHEFFIELD,          )
Personal Representative   )
of the Estate of          )
BURRELL RAMSEY-WHITE,     )   **FIRST AMENDED COMPLAINT**
     Plaintiff            )
                          )   **(LEAVE TO FILE GRANTED ON**
     v.                   )   **APRIL 25, 2016 (DOCKET #23))**
                          )
CITY OF BOSTON, MATTHEW   )   **JURY TRIAL DEMANDED**
PIEROWAY, JOEL RESIL,     )
MICHAEL MOES 1-10, and    )
MARY MOES 1-10,           )
     Defendants           )

**INTRODUCTION**

1.   This is a civil action brought by CARLA SHEFFIELD, as

     Personal Representative of the Estate of her deceased son,

     BURRELL RAMSEY-WHITE, who was shot to death by a Boston

     Police Officer, seeking compensation for the violations of

     her son's federal and state civil rights and the intentional

     torts committed against him, which culminated in her son's

     death.

**JURISDICTION AND VENUE**

2.   This Court has jurisdiction of this action pursuant to 28

     U.S.C. §1331, as this civil action arises under the

     Constitution and laws of the United States of America.

3.   Venue is proper in this District, pursuant to 28 U.S.C.

     §1391(b)(1) and (2), because the defendants reside in the

1

Commonwealth of Massachusetts and the events giving rise to this claim occurred within this District.

## PARTIES

4.   The plaintiff, CARLA SHEFFIELD, is an individual who resides at 24 Centre Avenue, #1L, Dorchester (Boston), Suffolk County, Commonwealth of Massachusetts, who brings this action as the Personal Representative of the Estate of BURRELL RAMSEY-WHITE, duly appointed by Letters of Authority for Personal Representative issued by the Suffolk Probate and Family Court in the *Estate of Burrell Anthony Ramsey-White*, Docket Number SU15P2000EA, on August 12, 2015.

5.   The defendant, CITY OF BOSTON, is a municipal corporation, duly organized under the laws of the Commonwealth of Massachusetts, which is located and has a principal place of business in Boston, Suffolk County, Commonwealth of Massachusetts, and which operates among its duly constituted governmental departments and agencies the Boston Police Department, which also is located and has a principal place of business in Boston, Suffolk County, Commonwealth of Massachusetts.

6.   The defendant, MATTHEW PIEROWAY, is an individual who at all times material was employed by the defendant, CITY OF BOSTON, as a police officer, and who had a principal place of business at the Boston Police Department in Boston,

2

Suffolk County, Commonwealth of Massachusetts.

7.   The defendant, JOEL RESIL, is an individual who at all times material was employed by the defendant, City of Boston, as a police officer, and who had a principal place of business at the Boston Police Department in Boston, Suffolk County, Commonwealth of Massachusetts.

8.   The defendants, MICHAEL MOES 1-10 and MARY MOES 1-10, are currently unknown to the plaintiff, but during all times material were employed by the defendant, CITY OF BOSTON, in the Boston Police Department, and who had a principal place of business at the Boston Police Department in Boston, Suffolk County, Commonwealth of Massachusetts.

## FACTS COMMON TO ALL COUNTS

9.   On August 21, 2012 at 4:00 p.m., defendants MATTHEW PIEROWAY ("PIEROWAY") and JOEL RESIL ("RESIL") reported for duty with the Boston Police Department's Anti-Crime Unit.

10.  Officers working in the Anti-Crime Unit wore street clothes and drove unmarked vehicles.

11.  PIEROWAY and RESIL were assigned to be partners for the shift.

12.  PIEROWAY and RESIL received a maroon, unmarked police vehicle for the shift.

13.  Lights and sirens were located inside the unmarked police vehicle.

3

14.  RESIL wore a red Nike t-shirt, shorts, and sneakers.

15.  PIEROWAY wore a green shirt with a Boston Celtics logo, shorts, and sneakers.

16.  At approximately 5:15 p.m. that day, officers in the area of Greenwich Park in Boston observed an individual peering into parked vehicles.

17.  The individual was described as a black male wearing a red t-shirt with the word "Georgia" written across the chest.

18.  PIEROWAY and RESIL proceeded to the area to assist with the search for the individual and to engage in Boston Police Department Field Interrogation, Observation, Frisk and/or Search practices ("FIO").

19.  At around this time, BURRELL RAMSEY-WHITE ("BURRELL"), an African American male, was operating a tan Cadillac ("the Cadillac") in the same area.

20.  BURRELL wore a white Ralph Lauren polo shirt with thin red stripes.

21.  BURRELL did not match the description of the person that had been looking into vehicles.

22.  The Cadillac belonged to Jurrell Laronal ("Laronal").

23.  PIEROWAY and RESIL saw the Cadillac on West Rutland Square in Boston, Suffolk County, Massachusetts.

24.  At the time PIEROWAY and RESIL saw the Cadillac on West Rutland Square, the Cadillac was not being operated in

violation of any motor vehicle or traffic laws or
ordinances.

25.  At the time PIEROWAY and RESIL saw the Cadillac on West
Rutland Square, the Cadillac was not being operated in a
suspicious manner.

26.  At the time PIEROWAY and RESIL saw the Cadillac on West
Rutland Square, the defendants did not believe that the
driver was the person for whom they were performing FIO
activities.

27.  Nevertheless, although there was no basis for either
probable cause or reasonable suspicion that the Cadillac or
its operator were engaging or had engaged in any type of
criminal activity, at 5:41 p.m., RESIL ran the Cadillac's
license plate.

28.  For at least fourteen (14) years before BURRELL was
investigated by the defendant Boston Police Officers,
federal and state courts in Massachusetts and "scholarly and
popular literature strongly suggest[ed] that there is racial
disparity in the rates at which African Americans are
stopped and prosecuted for traffic offenses." *U.S. v.
Leviner,* 31 F.Supp.2d 23, 24 (D. Mass. 1998).  "[T]he
studies described [] raise questions about what drew the
officer[s'] attention to [BURRELL] in the first place."
*Id.,* 31 F.Supp.2d at 33.

29.  The Massachusetts Supreme Judicial Court recognized that
     "[r]outine traffic stops may also pose unique hardships on
     minorities who, it has been argued, are often the subject of
     stops on pretext" in a 1999 decision which recognized
     greater State Constitutional protections for Massachusetts
     citizens under Article XIV of the Massachusetts Declaration
     of Rights than Federal Constitutional protections under the
     Fourth Amendment.  *Commonwealth v. Gonsalves*, 429 Mass. 658,
     663-64 (1999).

30.  Departing from U.S. Supreme Court decisions interpreting the
     Fourth Amendment, the Supreme Judicial Court wrote in
     *Gonsalves:*  "The rules in *[Pennsylvania v.] Mimms*[, 434 U.S.
     106 (1977)] and *[Maryland v.] Wilson*[, 519 U.S. 408 (1997)],
     which permit automobile exit orders during any traffic stop,
     but which do not require that such orders be given, are a
     clear invitation to discriminatory enforcement of the rule."
     *Id.,* 429 Mass. at 663-64.  The Supreme Judicial Court held
     such routine automobile exit orders prohibited by Article
     XIV.

31.  Citing an April 13, 1999 *Boston Globe* article, "Black
     Drivers Describe Harassment by Police," Justice Ireland
     wrote in his concurring opinion in *Gonsalves* that "[t]he
     widespread public concerns about police profiling, commonly
     referred to as 'DWB-driving while black,' has been the

6

subject of much discussion and debate both across the country and within the Commonwealth." *Id.,* 429 Mass. at 670.

32. Responding to public concerns about racial profiling, in 2000, more than a decade before the defendants stopped BURRELL, the Massachusetts General Court approved St. 2000, c. 228, "An Act Providing for the Collection of Data Relative to Traffic Stops ("Act")," "with the purpose of 'ensur[ing] that adequate efforts are being made to identify and eliminate any instances of racial and gender profiling by police officers in the performance of their official duties.'" *Boston Police Patrolmen's Ass'n., Inc. v. Police Dept. of Boston,* 446 Mass. 46, 47 (2006).

33. The Boston Police Patrolmen's Association ("Union") attempted to enjoin the enforcement of the Act, but the Supreme Judicial Court upheld a Superior Court decision rejecting the Union's challenge. *Boston Police Patrolmen's Ass'n., Inc. v. Police Dept. of Boston,* 446 Mass. 46 (2006).

34. Using and analyzing information collected from police officers pursuant to the Act, Northeastern University issued a report on May 4, 2004, "finding that 249 of 366 Massachusetts law enforcement agencies appeared to have engaged in racial or gender profiling, including the city [of Boston]." *Boston Police Patrolmen's Ass'n., Inc.,* 446

Mass. at 48; Kate L. Antonovics and Brian G. Knight, *"A New Look At Racial Profiling: Evidence From The Boston Police Department"* (National Bureau of Economic Research, July 2004)("*NEB Study*").

35. *NEB Study* "results suggest that preference-based discrimination plays a significant role in explaining differences in the rate at which motorists from different racial groups are searched during traffic stops." *NEB Study* at 26.

36. The defendant CITY had a study of its own conducted to analyze Boston Police Department data complied between the years 2007-2010 to inquire "into possible racial disparities in Boston Police Department Field Interrogation, Observation, Frisk and/or Search practices (informally known as FIO reports)." J. Fagan, et. als., *"Final Report[:] An Analysis of Race and Ethnicity Patterns in Boston Police Department Field Interrogation, Observation, Frisk, and/or Search Reports"* (June 15, 2015)("*BPD Final Report*").

37. Among the *BPD Final Report's* "[k]ey research findings" was: "Analyses revealed that the percentage of Black and Hispanic residents in Boston neighborhoods were also significant predictors of increased FIO activity after controlling for crime and other social factors. These racial disparities generate increased numbers of FIO reports in minority

8

neighborhoods above the rate that would be predicted by crime alone." *BPD Final Report* at i.

38. Among the *BPD Final Report's* "[k]ey research findings" was: "Black subjects experienced 8 percent higher numbers of repeat FIOs and were roughly 12 percent more likely to be frisked/searched during an FIO encounter, controlling for prior criminal history, gang membership, and other factors." *BPD Final Report* at i.

39. Among the *BPD Final Report's* "[k]ey research findings" was: "These analyses revealed racially disparate treatment of minority persons in BPD FIO activity." *BPD Final Report* at ii.

40. The *BPD Final Report* acknowledged that "Litigation has resulted in court oversight in nearly two dozen cities since 1996, and political tensions have contributed to wide divides in trust of the police between minority and white citizens." *BPD Final Report* at 1.

41. The *BPD Final Report* recognized that "FIO activity is the tactical expression of the Terry stop regime and proactive policing in Boston." *BPD Final Report* at 1.

42. The *BPD Final Report* concluded that "[c]ompared to the residential population, the targets of FIO reports were disproportionately male, young, and Black. For these 204,739 FIO reports, the subjects were 89.0 percent male,

54.7 percent ages 24 or younger, and 63.3 percent Black. According to the U.S. Census Bureau, in 2010, Boston had some 617,594 residents that were 47.9 percent male, 36.2 percent ages 24 or younger, and 25.1 percent black." *BPD Final Report* at 2.

43. The *BPD Final Report* observed that "75.0 percent (153,554) of the FIO reports simply state 'investigation person' as the justification.  This absence of evidence of stop rationales prevents a Fourth Amendment analysis of the constitutionality of discretionary stops and searches of FIO subjects." *BPD Final Report* at 3.

44. The *BPD Final Report* noted that "the number of repeat FIO reports per [Boston Police] officer is also highly concentrated among a small number of individuals." *BPD Final Report* at 8.

45. The *BPD Final Report* noted that "[t]he pattern of race effects suggests evidence of disparate treatment in FIO activity based on neighborhood racial composition.  After controlling for local crime rates, we observe higher rates of FIO activity for census tracts based on their Black or Hispanic racial composition, whether in residents, arrestees, or the race of known crime suspects." *BPD Final Report* at 8.

46. The *BPD Final Report* concluded: "Theses *[sic]* analyses also

revealed racially disparate treatment of minority persons in BPD FIO activity.  Controlling for a wide range of covariates and using three different benchmarks, the analyses demonstrated that neighborhoods with higher percentages of Black and Hispanic residents experienced higher numbers of FIOs relative to 'average' Boston neighborhoods." *BPD Final Report* at 20.

47.  The *BPD Final Report* concluded: "controlling for gang membership and prior criminal history, Black and Hispanic FIO subjects are more likely to experience repeated FIO encounters and are more likely to be searched during FIO encounters relative to white subjects."  *BPD Final Report* at 20.

48.  The *BPD Final Report* concluded:  "Officer race explains part of the racial and ethnic disparities in FIO activity. During the time period of the study, we find higher FIO activity for White officers for suspects of all races, including White suspects, compared to Black, Hispanic or Asian officers.  Comparing within-suspect race results, we see signs of preference-based discrimination by White officers. ... this research cannot determine whether the identified patterns were generated by bias or other processes of racial discrimination in BPD FIO practices." *BPD Final Report* at 20-21.

49.  Discussing Boston Police Department supervision and
     oversight procedures, the *BPD Final Report* stated: "It is
     also important to note that the regulation and oversight of
     FIO policy and activities takes place at the police district
     level.  There are 12 police districts in Boston, each
     commanded by a police captain who reports directly to the
     Superintendent of the Bureau of Field Services.  BPD
     Captains are accountable for district-level crime trends and
     have discretion to allocate officers tactically within
     districts." *BPD Final Report* at 26.

50.  In response to the *BPD Final Report*, Boston Police
     Department Commissioner William Evans indicated that the
     Boston Police Department would institute "new antibias
     policies," entitled "Bias-Free Policing Policy," "which
     forbids policing based on characteristics such as race and
     gender" and warned that Boston Police Officers would face
     discipline for engaging in biased policing. *Boston Globe,*
     "Boston Police to Step Up Antibias Measures" (July 4, 2015).

51.  Boston Police Commissioner Evans also stated that new
     policies would "require[] officers to document specific
     information that caused them to stop a person in the first
     place." *Id.*

52.  The Boston Police Department response included a commitment
     to train Boston Police supervisors "to spot potential bias

12

and to broach it with their officers in a constructive
way[,]" and to retrain officers who performed the most FIOs.
*Id.*

53. Analyzing the same data as the BPD Final Report, the
American Civil Liberties Union Foundation of Massachusetts
issued a separate report entitled *"Black, Brown and
Targeted"* (October 2014)(*"ACLUM Report"*).

54. The *ACLUM Report* concluded that "[t]he [BPD Final Report]
findings confirm what many people from communities of color
have long suspected: Boston police officers targeted people
of color at far greater rates than white people."  *ACLUM
Report* at 1.

55. The *ACLUM Report* concluded that reasons supplied by Boston
Police officers for stopping suspects violated Article 14 of
the Massachusetts Declaration of Rights and the Fourth
Amendment of the U.S. Constitution because they did not
state individualized, reasonable suspicions of wrongdoing
and did not provide constitutionally permissible reasons for
stopping and/or frisking suspects.  *ACLUM Report* at 1.

56. The *ACLUM Report* posited that Boston Police Department
"practices between 2007 and 2010 were arguably even more
racially skewed than the New York City Police Department's
(NYPD) tactics ruled unconstitutional in 2013 by a federal
court" and the BPD's "investigate person" rationale for FIOs

"is worse than the 'furtive movement' rationale that was used by NYPD officers in 51.3% of their stops and frisks." The *ACLUM Report* noted that a federal court "ruled that 'furtive movement' is so vague that it fails to justify a stop or frisk." *ACLUM Report* at 6 and 11, *citing Floyd v. City of New York,* 959 F.Supp.2d 540, 558-59 (S.D.N.Y. 2013).

57. The *ACLUM Report* observed that the reasons supplied by Boston Police Officers for stopping suspects "cannot explain, either to the public or to a BPD supervisor, why the officer did so[,]" and "undermine[d] supervision, enabling BPD officers to avoid both individual and collective accountability to the Department, the people, and the communities that they are supposed to protect and serve." *ACLUM Report* at 11-12.

58. Analyzing Boston Police Department training and supervision policies, the *ACLUM Report* concluded that "[t]he BPD's deficient practices from 2007 to 2010 appear to reflect deficient policies[,]" which did not prohibit illegal racially biased policing, or instruct and train BPD officers how to comply with legal requirements, or require Boston Police supervisors to correct, discipline, and prevent illegal racially biased policing, or ensure the proper supervision of Boston Police supervisors. *ACLUM Report* at 14-17.

59.  Data released by the Boston Police Department covering FIO
     reports for the period 2011-2015, the period during which
     the encounter that leads to the instant action occurred,
     indicates that Black males continued to be stopped in
     numbers disproportionate to their percentage of the
     population, and that the primary reason given for stopping
     suspects remained "investigate person" after which the next
     reason was "violating auto laws." *Boston Globe,* "Boston
     Police Data Shows Black Men Were Stopped Most Often"
     (January 19, 2016).

60.  Not dissimilar to its treatment of the general public,
     courts and tribunals in Massachusetts have found the Boston
     Police Department to engage in racially discriminatory
     conduct towards its own officers and recruits in matters of
     promotion and discipline during the same time frame. *See
     e.g., Smith v. City of Boston,* No. 12-cv-10291-WGY, Findings
     of Fact, Rulings of Law, and Order (D. Mass. Nov. 16, 2015)
     (ruling 2008 BPD lieutenant promotional examination violated
     Title VII and M.G.L. c. 151B), and *MCAD v. Boston Police
     Department,* No. 11-BEM-03416, Decision of the Hearing
     Officer (MCAD, Dec. 28, 2015)(ruling BPD imposed racially
     disparate discipline on BPD recruits).

61.  Although the Cadillac PIEROWAY and RESIL observed on West
     Rutland Square had broken no laws, was being operated

properly, and was in good condition, PIEROWAY and RESIL followed the Cadillac.

62.    After PIEROWAY and RESIL followed the Cadillac for several blocks, during which the Cadillac reached a dead end street and properly turned back, the Boston Police Department's Computer-Assisted Dispatch information revealed the owner of the Cadillac, Laronal, had an outstanding default warrant.

63.    PIEROWAY and RESIL ordered the Cadillac to stop.

64.    Obeying PIEROWAY and RESIL'S instruction, BURRELL stopped the Cadillac.

65.    PIEROWAY and RESIL — dressed in street clothes —  approached the Cadillac stopped on West Rutland Square from both sides of the vehicle.

66.    PIEROWAY asked BURRELL for his license and registration, and looked into the Cadillac.

67.    PIEROWAY observed that BURRELL was alone in the Cadillac.

68.    BURRELL asked PIEROWAY why he stopped him.

69.    PIEROWAY did not answer BURRELL but again asked for his license and registration.

70.    BURRELL provided his license to PIEROWAY and again asked why PIEROWAY stopped him.

71.    PIEROWAY again refused to respond to BURRELL.

72.    PIEROWAY did not examine BURRELL'S license, but held it in his hand.

73. An examination of the license would have shown a Boston Police officer interested in determining whether the operator of the vehicle was the person who had an outstanding warrant that the operator of the Cadillac, BURRELL, was not the owner of the Cadillac and was not the individual whose name appeared on the warrant.

74. Laronal was not in the Cadillac at the time PIEROWAY and RESIL stopped the vehicle; only BURRELL was in the vehicle.

75. The Cadillac had not been reported stolen.

76. PIEROWAY and RESIL expressed no concern that the vehicle had been stolen.

77. RESIL observed the license briefly and saw the name on the license was not the name on the warrant, but did not tell PIEROWAY or BURRELL, or take any action to clarify the situation.

78. PIEROWAY made no effort to determine whether BURRELL was the person whose name appeared on the warrant, but determined to arrest the operator for questioning the defendants' orders.

79. PIEROWAY never told BURRELL that he was under arrest or that he was required to comply with the non-uniformed individual's directions, or that he was not free to leave.

80. PIEROWAY asked BURRELL to shut the engine, and BURRELL shut the engine.

81. PIEROWAY told BURRELL to exit the vehicle.

82. BURRELL asked PIEROWAY why he needed to exit the vehicle and what he had done wrong.

83. PIEROWAY did not answer BURRELL, but instead grabbed at the Cadillac's driver's side door handle and pulled on the locked door.

84. Unable to open the door, PIEROWAY thrust his arm into the open window of the Cadillac.

85. PIEROWAY put BURRELL'S driver's license on the roof of the Cadillac, as he thrust his arm at and into the vehicle.

86. On the passenger side of the Cadillac, RESIL put his hand on his holstered firearm.

87. Threatened by the violence of the armed men who were not wearing police uniforms and making unexplained and seemingly unjustified demands, BURRELL restarted the vehicle, closed the window, and drove away.

88. As BURRELL drove away, his license wedged between the rear window and the trunk of the Cadillac, where it was visible to PIEROWAY and RESIL at all times material.

89. BURRELL drove toward Columbus Avenue.

90. At no time did PIEROWAY or RESIL determine or attempt to determine whether the operator, BURRELL, was the owner of the vehicle (Laronal).

91. At no time before killing him, did PIEROWAY read BURRELL's license, or did RESIL tell PIEROWAY that the name on the

license did not match the name on the warrant.

92. PIEROWAY and RESIL pursued BURRELL.

93. Rule 301 of the Boston Police Department's Rules and Procedures ("Rule 301"), applicable in August, 2012, forbids Police vehicles without operable overhead blue lights from engaging in a pursuit.

94. PIEROWAY and RESIL violated Rule 301 because their vehicle did not have operable overhead blue lights.

95. Rule 301 forbids pursuit ". . . unless the occupants[—not owners—]of the vehicle are known to be wanted for the commission or attempted commission of a violent or life threatening felony."

96. PIEROWAY and RESIL violated Rule 301 because they did not know whether BURRELL had committed the crime associated with the Cadillac's owner or whether BURRELL was wanted for the commission or attempted commission of a violent or life threatening felony.

97. PIEROWAY drove the unmarked police car with sirens and lights activated.

98. BURRELL turned left onto Columbus Avenue.

99. As PIEROWAY and RESIL pursued BURRELL, RESIL announced over the radio that they were pursuing the Cadillac.

100. BURRELL took a left turn onto West Newton Street, followed by a right onto Saint Botolph Street.

101. PIEROWAY and RESIL continued their pursuit.

102. PIEROWAY and RESIL saw BURRELL's drivers license stuck on the rear window of the Cadillac during their pursuit.

103. While on Saint Botolph Street, the Boston Police Department Operations Supervisor ordered PIEROWAY and RESIL to terminate the pursuit.

104. BURRELL took a right turn onto Harcourt Street.

105. Despite the Boston Police Department supervisor's orders to terminate pursuit, PIEROWAY and RESIL continued to operate the lights of their vehicle and pursue the Cadillac.

106. The order to terminate pursuit was consistent with Rule 301, which prioritizes the safety of the public and officers in pursuit driving situations.

107. PIEROWAY and RESIL violated Rule 301, which prohibits the operation of lights and following a suspect's vehicle after a pursuit is ordered terminated.

108. BURRELL abandoned the Cadillac where Harcourt Street meets Southwest Corridor Path.

109. The total distance of PIEROWAY and RESIL's vehicle pursuit was approximately half of one mile.

110. When BURRELL abandoned his vehicle on Harcourt Street, he ran across Southwest Corridor Path.

111. PIEROWAY, dressed in street clothes and armed, pursued BURRELL on foot.

112. As PIEROWAY exited his vehicle, RESIL yelled: "Get him, P."

113. PIEROWAY and RESIL should have obeyed the orders to terminate the pursuit and still would have been able to identify BURRELL and hold him accountable for his flight from West Rutland Square because BURRELL left his driver's license visible along with other evidence in the Cadillac, which BURRELL abandoned at the scene as the defendants chased him for no obvious legitimate reason.

114. RESIL checked the Cadillac to ensure the vehicle was in park.

115. After checking the Cadillac, RESIL, armed and dressed in street clothes, joined PIEROWAY's foot chase of BURRELL.

116. BURRELL ran left on Carleton Street.

117. BURRELL followed Carleton Street as it veered right to become Yarmouth Street.

118. Once on Yarmouth Street, BURRELL took a left onto Yarmouth Place.

119. PIEROWAY used the same route as he pursued BURRELL.

120. As PIEROWAY chased BURRELL, he yelled at BURRELL to stop running away.

121. PIEROWAY threatened to shoot BURRELLL.

122. PIEROWAY's statements during the foot chase included:

   a.   "Stop."

   b.   "Fucking stop."

c.   "Stop. Police. Stop."

d.   "Stop or I will shoot."

e.   "If you don't stop, I will shoot you."

f.   "Stop running or I'm going to fucking kill you."

g.   "Stop reaching"

h.   "Don't reach for your pockets."

i.   "Put your hands where I can see them.  Stop."

j.   "If you reach, I'll shoot.  Stop reaching or I'll
     shoot."

k.   "You better watch your back."

l.   "I'm gonna fucking shoot you."

123. Before rounding the corner to Yarmouth Place, PIEROWAY
     yelled, "Stop.  I need to see your hands.  I'll shoot you."
     After yelling this, he drew his weapon and continued running
     in BURRELL's direction.

124. At no time during this chase did BURRELL say anything to
     PIEROWAY, threatening or otherwise, and at no time during
     this chase did BURRELL do anything except try to run away
     from the man who was chasing him.

125. Once on Yarmouth Place, BURRELL ran towards a door at or
     near 7 Yarmouth Place.

126. To reach the door, BURRELL ran up three steps and stood on
     the landing.

127. BURRELL attempted to open the door, but it was locked.

128. On the side of the landing closest to Yarmouth Street was a railing.

129. Just below the railing were two dumpsters.

130. On the side of the landing furthest from Yarmouth Street was a railing.

131. By the time BURRELL reached the door, PIEROWAY had caught up with BURRELL.

132. PIEROWAY, in his street clothes with a drawn weapon, stood at the bottom of the stairs.

133. BURRELL turned towards PIEROWAY.

134. PIEROWAY aimed for BURRELL's chest and fired his weapon.

135. The bullet struck BURRELL in the left portion of his rib cage.

136. PIEROWAY shouted at BURRELL, "Stop.  Don't make me shoot you again."

137. BURRELL fell backwards.

138. RESIL, near the scene at the time of the shooting, heard the gunshot and PRIEROWAY shout "Don't make me shoot you again."

139. Seconds after PIEROWAY shot BURRELL, RESIL arrived at the scene.

140. When RESIL arrived, PIEROWAY told RESIL that BURRELL had been shot in the chest and BURRELL's gun was in the dumpster.

141. RESIL used his radio to call in a "Code 303," which

indicates officer-involved shootings.

142. RESIL did not use his radio to report BURRELL's injury or request Emergency Medical Services ("EMS").

143. PIEROWAY did not ask RESIL to request EMS.

144. Rule 303 of Boston Police Department's Rules and Procedures ("Rule 303"), applicable in August, 2012, forbids discharge of a firearm unless ". . . [t]here is no less drastic means available to defend oneself or another from unlawful attack which an officer has reasonable cause to believe could result in death or great bodily injury . . ." or ". . . [t]here is no less drastic means available to apprehend a fleeing felon . . . ."

145. PIEROWAY violated Rule 303 when he used deadly force against BURRELL; PIEROWAY neither needed to defend himself nor was he apprehending a fleeing felon.

146. Even though BURRELL was lying on the ground with a severe gunshot wound—in no condition to harm the officers—PIEROWAY and RESIL failed to render medical assistance.

147. PIEROWAY and RESIL handcuffed BURRELL, with his hands behind his back.

148. Then, RESIL looked and found a gun in the dumpster.

149. After RESIL looked at the gun, he checked BURRELL for weapons.  He found none.

150. Rule 315 of Boston Police Department's Rules and Procedures

("Rule 315"), applicable in August, 2012, provides officers with discretion to abstain from using handcuffs in exigent circumstances.

151. Rule 315 did not prohibit PIEROWAY and RESIL from rendering prompt medical aid to BURRELL.

152. RESIL asked BURRELL to turn over, but BURRELL was unresponsive.

153. RESIL rolled BURRELL onto his side.

154. RESIL saw BURRELL's eyes roll back in his head and heard him gasp for air.

155. Detective Daniel E. MacDonald, Sergeant Detective Donald Keenan, and Officer Brendan O'Donnell arrived on the scene when BURRELL was on his side.

156. After learning that PIEROWAY shot BURRELL, Detective MacDonald, Sergeant Detective Keenan, and Officer O'Donnell immediately began to render aid to BURRELL.

157. Sergeant Detective Keenan requested that EMS respond.

158. Officers quickly determined BURRELL was not breathing and had no pulse.

159. Sergeant Detective Keenan uncuffed BURRELL and began cardiopulmonary resuscitation ("CPR").

160. Detective MacDonald, Sergeant Detective Keenan, and Officer O'Donnell moved BURRELL to the sidewalk to allow officers to provide proper aid.

161. Sergeant Detective Keenan continued CPR until EMS arrived.

162. BURRELL was transported to Boston Medical Center, where he was pronounced dead.

163. Dr. Henry Nields, Chief Medical Examiner of the Massachusetts Office of the Chief Medical Examiner, performed an autopsy on BURRELL.

164. Dr. Nields determined the cause of death was a gunshot wound to the torso.

165. Dr. Nields determined the manner of death was a homicide.

166. Investigation of the scene of the shooting by Boston Police officers found a Bersa model Thunder 380 pistol, serial number 416458, in the dumpster, containing six cartridges in a magazine.

167. The Bersa pistol was subsequently tested for fingerprints and spent cartridges*, inter alia*.

168. Investigation by the Boston Police Department and Massachusetts Crime Laboratory did not reveal BURRELL's fingerprints on the pistol and did not provide evidence of spent cartridges from the Bersa in the area where PIEROWAY killed BURRELL.

169. Inasmuch as BURRELL had been shot to death by a Boston Police Officer, the Suffolk County District Attorney's Office was obliged to investigate the shooting to determine whether criminal charges should be initiated against

PIEROWAY and/or RESIL.

170. On December 2, 2013, while the Suffolk County District
Attorney was investigating the shooting of BURRELL by
PIEROWAY, and before the District Attorney announced that he
would not pursue criminal charges, the Boston Police
Department honored PIEROWAY with the Medal of Valor and
honored RESIL with Meritorious Recognition.

171. The defendant CITY's Police Department honored PIEROWAY and
RESIL notwithstanding those defendants' apparent violations
of Boston Police Department Rules and Procedures, as
aforesaid.

172. The Boston Police Department has a policy or practice or
custom of honoring Boston Police Officers who are suspected
of misconduct, including criminal misconduct, during the
pendency of legal proceedings, for the implicit purpose of
influencing the outcome of those legal proceedings in favor
of the officers.

173. Among the Boston Police Officers who have been awarded
honors by the Boston Police Department contemporaneously
with legal proceedings against them, were Officer Brian
Dunford, while he was defending a civil case charging him
with civil rights violations for beating a Black Boston
firefighter; Officer Michael McManus, who was a defendant in
a civil rights case brought by the family of a man who died

after being arrested by Boston Police in 2008 and who was videotaped beating a 17 year old Black teen at Roxbury Community College; Officer Christopher Carr, who was involved in a police chase which resulted in the shooting death of a Black civilian; and Sergeant Edwin Guzman, who was awarded the Boston Police Department's Medal of Honor in the same year in which he was criminally prosecuted for disseminating lewd images to a 16 year old girl, and annoying and accosting her.

174. The Suffolk County District Attorney declined to prosecute defendants PIEROWAY and RESIL.

175. The Boston Police Department did not discipline defendants PIEROWAY or RESIL for their violations of Boston Police Department Rules and Procedures, as aforesaid.

### COUNT I: BATTERY UPON BURRELL RAMSEY-WHITE BY DEFENDANT MATTHEW PIEROWAY

176. The plaintiff adopts, repeats, realleges, and incorporates by reference the allegations set forth in the preceding paragraphs as though they were fully set forth herein.

177. Defendant PIEROWAY engaged in intentional acts of unlawful conduct directed at BURRELL RAMSEY-WHITE, which resulted in serious injuries causing his death.

178. Defendant PIEROWAY utilized unreasonable, unlawful, and excessive force by shooting BURRELL RAMSEY-WHITE with a deadly weapon, his Boston Police Department service pistol.

179. BURRELL RAMSEY-WHITE did not consent nor provoke the described contact by Defendant PIEROWAY.

180. The conduct of Defendant PIEROWAY was without legal justification.

181. As a direct and proximate result of the battery perpetrated by Defendant PIEROWAY upon BURRELL RAMSEY-WHITE, BURRELL RAMSEY-WHITE sustained significant physical injuries, pain, and suffering, which resulted in his death.

### COUNT II: ASSAULT UPON BURRELL RAMSEY-WHITE BY DEFENDANTS MATTHEW PIEROWAY AND JOEL RESIL

182. The plaintiff adopts, repeats, realleges, and incorporates by reference the allegations set forth in the preceding paragraphs as though they were fully set forth herein.

183. Defendants PIEROWAY and RESIL engaged in intentional acts of unlawful conduct directed at BURRELL RAMSEY-WHITE, which reasonably made BURRELL RAMSEY-WHITE apprehensive of immediate physical harm.

184. Defendant PIEROWAY's overt acts included approaching BURRELL in street clothes in an offensive manner, grabbing the door handle of the stopped motor vehicle in which BURRELL was sitting, violently thrusting his arm into the open car window towards BURRELL, pursuing BURRELL in an unmarked vehicle, shouting verbal threats of physical harm, as well as pointing a deadly firearm at BURRELL RAMSEY-WHITE.

185. Defendant RESIL's overt acts included approaching BURRELL in

street clothes in an offensive manner, placing his hand on his firearm in a threatening manner, and pursing BURRELL in an unmarked vehicle.

186. BURRELL RAMSEY-WHITE did not consent nor provoke the described contact by Defendants PIEROWAY or RESIL.

187. The conduct of Defendants PIEROWAY and RESIL was without legal justification.

188. As a direct and proximate result of the assaults perpetrated by Defendants PIEROWAY and RESIL upon BURRELL RAMSEY-WHITE, BURRELL RAMSEY-WHITE became apprehensive of immediate physical harm.

## COUNT III: VIOLATION OF THE MASSACHUSETTS CIVIL RIGHTS ACT BY DEFENDANT MATTHEW PIEROWAY

189. The plaintiff adopts, repeats, realleges, and incorporates by reference the allegations set forth in the preceding paragraphs as though they were fully set forth herein.

190. Defendant PIEROWAY interfered with BURRELL RAMSEY-WHITE'S enjoyment and exercise of his rights protected by the constitutions and laws of the United States and of the Commonwealth of Massachusetts, by threats, intimidation, and coercion designed to interfere with BURRELL RAMSEY-WHITE's exercise of his rights to life and liberty, to be secure in his person and effects from unlawful searches and seizures, and to due process of and equal protection of law, as provided, preserved, and protected by the Constitution of

30

the United States, including, without limitation, the
Fourth, Fifth, and Fourteenth Amendments, and by the
Declaration of Rights of the Commonwealth of Massachusetts,
including, without limitation, the Preamble and Articles I,
X, XI, XII, and XIV.

191. As a direct and proximate result of defendant PIEROWAY's
violation of BURRELL RAMSEY-WHITE's civil rights, BURRELL
RAMSEY-WHITE suffered the damages aforesaid, warranting
recovery pursuant to M.G.L. c. 12, §11H and §11I.

### COUNT IV: VIOLATION OF THE MASSACHUSETTS CIVIL RIGHTS ACT
### BY DEFENDANT JOEL RESIL

192. The plaintiff adopts, repeats, realleges, and incorporates
by reference the allegations set forth in the preceding
paragraphs as though they were fully set forth herein.

193. Defendant RESIL interfered with BURRELL RAMSEY-WHITE's
enjoyment and exercise of his rights protected by the
constitutions and laws of the United States and of the
Commonwealth of Massachusetts by threats, intimidation, and
coercion, designed to interfere with BURRELL RAMSEY-WHITE's
exercise of his rights to life and liberty, to be secure in
his person and effects from unlawful searches and seizures,
and to due process and equal protection of law, as provided,
preserved, and protected by the Constitution of the United
States, including, without limitation, the Fourth, Fifth,
and Fourteenth Amendments, and by the Declaration of Rights

of the Commonwealth of Massachusetts, including, without limitation, the Preamble and Articles I, X, XI, XII, and XIV, including without limitation, by enabling, ratifying, and condoning Defendant PIEROWAY's violation of BURRELL RAMSEY-WHITE's rights, as well as by his own conduct.

194. As a direct and proximate result of defendant RESIL's violations of BURRELL RAMSEY-WHITE's civil rights, BURRELL RAMSEY-WHITE suffered the damages aforesaid, warranting recovery pursuant to M.G.L. c. 12, §11H and §11I.

**COUNT V: VIOLATION OF BURRELL RAMSEY-WHITE'S
FEDERAL CIVIL RIGHTS BY DEFENDANT MATTHEW PIEROWAY**

195. The plaintiff adopts, repeats, realleges, and incorporates by reference the allegations set forth in the preceding paragraphs as though they were fully set forth herein.

196. At all times relevant to this Complaint, BURRELL RAMSEY-WHITE had the rights afforded to him by the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution not to have his person or property unlawfully searched, seized, or detained in an unreasonable manner; not to be deprived of his life or liberty without due process of law; not to be subjected to excessive force during the course of an alleged stop or an arrest; not to be subjected to disparate and unequal treatment under the law; and not to be unreasonably denied necessary medical treatment.

197. Defendant PIEROWAY violated BURRELL RAMSEY-WHITE's

constitutional and civil rights in the following manners,
*inter alia*:

a.   Defendant PIEROWAY illegally stopped and attempted to
     seize BURRELL RAMSEY-WHITE without probable cause or
     reasonable suspicion to believe that BURRELL RAMSEY-
     WHITE was engaging or had engaged in criminal activity.

b.   Defendant PIEROWAY pursued BURRELL RAMSEY-WHITE after
     being ordered to cease pursuit in circumstances where
     BURRELL RAMSEY-WHITE posed no immediate threat to the
     safety of others or officers.

c.   After Defendant PIEROWAY chased BURRELL RAMSEY-WHITE to
     an area without any escape route, Defendant PIEROWAY
     shot BURRELL RAMSEY-WHITE in the chest.

d.   After Defendant PIEROWAY wounded BURRELL RAMSEY-WHITE
     in the chest, BURRELL RAMSEY-WHITE was in no condition
     to harm himself or others; nevertheless, Defendant
     PIEROWAY failed to promptly and efficiently provide or
     request emergency medical care.  Instead, PIEROWAY
     slowly handcuffed and searched BURRELL RAMSEY-WHITE,
     without any consideration for the exigent circumstances
     of BURRELL RAMSEY-WHITE's medical emergency.

198. At all times relevant herein, Defendant PIEROWAY knowingly
     acted to deprive BURRELL RAMSEY-WHITE of his constitutional
     rights set forth above, maliciously and with reckless

disregard.

199. As a direct and proximate result of the defendant's violation of BURRELL RAMSEY-WHITE's civil rights, BURRELL RAMSEY-WHITE suffered the damages aforesaid, warranting recovery pursuant to 42 U.S.C. §1983 and §1988.

### COUNT VI: VIOLATION OF BURRELL RAMSEY-WHITE'S FEDERAL CIVIL RIGHTS BY DEFENDANT JOEL RESIL

200. The plaintiff adopts, repeats, realleges, and incorporates by reference the allegations set forth in the preceding paragraphs as though they were fully set forth herein.

201. At all times relevant to this Complaint, BURRELL RAMSEY-WHITE had the rights afforded to him by the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution, to not have his person or property unlawfully searched, seized, or detained in an unreasonable manner; not to be deprived of his life or liberty without due process of law; not to be subjected to excessive force during the course of an alleged stop or an arrest; not to be subjected to disparate and unequal treatment under the law; and not to be unreasonably denied necessary medical treatment.

202. Defendant RESIL violated BURRELL RAMSEY-WHITE'S constitutional and civil rights in the following manners, *inter alia*:

   a.   Defendant RESIL illegally stopped and attempted to seize BURRELL RAMSEY-WHITE without probable cause or

34

reasonable suspicion to believe that BURRELL RAMSEY-
WHITE was engaging or had engaged in criminal activity.

b.   Defendant RESIL aided, encouraged, and joined Defendant
PIEROWAY in pursuing BURRELL RAMSEY-WHITE after being
ordered to cease pursuit in circumstances where BURRELL
RAMSEY-WHITE posed no immediate threat to the safety of
others or officers.

c.   As soon as he arrived on the scene, RESIL learned
BURRELL RAMSEY-WHITE had been shot, and BURRELL RAMSEY-
WHITE's alleged firearm was in the dumpster.  Because
of this wound, BURRELL RAMSEY-WHITE was in no condition
to harm himself or others; nevertheless, Defendant
RESIL failed to promptly and efficiently provide or
request emergency medical care.  Instead, RESIL slowly
handcuffed BURRELL RAMSEY-WHITE, approached the
dumpster to look at the weapon, and searched BURRELL
RAMSEY-WHITE, without any consideration for the exigent
circumstances of BURRELL RAMSEY-WHITE's medical
emergency.

203. At all times relevant herein, Defendant RESIL knowingly
acted to deprive BURRELL RAMSEY-WHITE of his constitutional
rights set forth above, maliciously and with reckless
disregard.

204. As a direct and proximate result of the defendant's

35

violation of BURRELL RAMSEY-WHITE's civil rights, BURRELL
RAMSEY-WHITE suffered the damages aforesaid, warranting
recovery pursuant to 42 U.S.C. §1983 and §1988.

### COUNT VII: VIOLATION OF BURRELL RAMSEY-WHITE'S FEDERAL CIVIL RIGHTS BY DEFENDANTS MICHAEL MOES 1-10 AND MARY MOES 1-10

205. The plaintiff adopts, repeats, realleges, and incorporates
by reference the allegations set forth in the preceding
paragraphs as though they were fully set forth herein.

206. At all times material, defendants MICHAEL MOES 1-10 and MARY
MOES 1-10 served as supervising officers of the Boston
Police Department, responsible for employing, training,
supervising, and disciplining the Boston Police officers who
served under their command, and for developing, enforcing,
supervising, and maintaining policies, practices,
procedures, and customs for training and enforcing federal
and Massachusetts criminal laws and procedures, Boston
Police Department Rules and Procedures, and pursuit and
investigation methods.

207. As supervising superior officers, defendants  MICHAEL MOES
1-10 and MARY MOES 1-10 developed, enforced, supervised, and
maintained policies, practices, procedures, and customs
which exhibited deliberate indifference to the
constitutional rights of persons in Boston, particularly
persons of color, which caused the violations of BURRELL
RAMSEY-WHITE's rights.

208. It was the policy and/or custom of these defendants to
     inadequately train, supervise, and discipline Boston Police
     officers, including defendant PIEROWAY, defendant RESIL, and
     other officers under their commands, in the knowledge of
     enforcement of federal and Massachusetts criminal
     procedures, Boston Police Department Rules and Procedures,
     nondiscriminatory and equal enforcement of the laws, and
     pursuit and investigation methods, thereby encouraging
     violations of such laws and procedures by Boston Police
     officers and failing to discourage constitutional violations
     by Boston Police officers.

209. It was the policy, practice, and/or custom of these
     defendants to inadequately investigate citizens' complaints
     of police misconduct and violations of law, and acts of
     misconduct and violations of law instead were tolerated and
     sanctioned by these defendants.

210. As a result of the above described polices, practices,
     procedures, and customs, Boston Police officers — including,
     without limitation, Defendants PIEROWAY and RESIL — believed
     their actions would not be properly monitored by supervising
     superior officers, and that misconduct would not be
     investigated or sanctioned, but would be tolerated and
     ratified instead.

211. The above described policies, practices, procedures, and

customs demonstrated deliberate indifference on the part of defendants MICHAEL MOES 1-10 and MARY MOES 1-10 to the constitutional rights of persons within the defendant CITY OF BOSTON, especially persons of color, and were the cause of the violations of BURRELL RAMSEY-WHITE's rights alleged herein.

212. Defendants MICHAEL MOES 1-10 and MARY MOES 1-10 violated BURRELL RAMSEY-WHITE's civil rights, protected by the constitutions and laws of the United States and of the Commonwealth of Massachusetts, by the intentional and deliberately indifferent manner in which, pursuant to policy, practice, procedure, and/or custom, they failed and refused to properly instruct, train, supervise, discipline, and command the police officers under their command in knowledge and enforcement of federal and Massachusetts criminal procedures, Boston Police Department Rules and Procedures, nondiscriminatory and equal enforcement of the laws, pursuit and investigation methods, and, in particular, in the manner in which they enabled, authorized, condoned, sanctioned, and ratified the Boston Police violations of BURRELL RAMSEY-WHITE's constitutional and statutory rights to be free from unlawful searches and seizures, be free from excessive force, be treated equally and without discrimination under the law, enjoy due process and equal

protection of law, and enjoy, and find security in other constitutional and statutory rights, *inter alia*.

213. As a direct and proximate result of the defendants' violations of BURRELL RAMSEY-WHITE's civil rights, BURRELL RAMSEY-WHITE suffered the damages aforesaid, warranting recovery pursuant to 42 U.S.C. §1983 and §1988.

**COUNT VIII: VIOLATION OF BURRELL RAMSEY-WHITE'S FEDERAL CIVIL RIGHTS BY DEFENDANT CITY OF BOSTON**

214. The plaintiff adopts, repeats, realleges, and incorporates by reference the allegations set forth in the preceding paragraphs as though they were fully set forth herein.

215. The defendant CITY OF BOSTON developed, enforced, supervised, and maintained policies, practices, procedures, and/or customs which exhibited deliberate indifference to the constitutional rights of persons in Boston, particularly persons of color, which caused the violations of BURRELL RAMSEY-WHITE's rights.

216. It was the policy, practice, and/or custom of the defendant CITY OF BOSTON to inadequately train, supervise, and discipline Boston Police officers, including, without limitation, defendants PIEROWAY, RESIL, MICHAEL MOES 1-10, and MARY MOES 1-10, in the knowledge and enforcement of federal and Massachusetts criminal procedures, Boston Police Department Rules and Procedures, nondiscriminatory and equal enforcement of the laws, and proper methods of pursuit and

investigation, thereby encouraging violations of such laws and procedures by Boston Police officers and supervisors, and failing to discourage constitutional violations by Boston Police officers and supervisors.

217. The defendant CITY OF BOSTON knew or should have known that defendants PIEROWAY, RESIL, MICHAEL MOES 1-10, MARY MOES 1-10, and other employees of the defendant CITY OF BOSTON, were involved in the formulation and execution of policies, practices, and procedures which illegally abridged the rights and privileges of BOSTON residents, especially persons of color.

218. Despite actual or constructive knowledge of the aforesaid policies, practices, and procedures of defendants PIEROWAY, RESIL, MICHAEL MOES 1-10, MARY MOES 1-10, and other employees of the defendant CITY OF BOSTON, the defendant CITY OF BOSTON did not stop or curtail such misconduct but rather condoned and ratified it by refusing to correct, discipline, or prevent such misconduct and by rewarding it instead.

219. The defendants' acts and omissions, pursuant to policies, practices, and customs which were well known and widely practiced, constitute conduct under the color of law, within the meaning of 42 U.S.C. §1983, which deprived BURRELL RAMSEY-WHITE of his statutory and constitutional rights and

privileges including, without limitation, his right to be
free from illegal searches and seizures, be free from
excessive force, be treated equally and without
discrimination under the law, and to due process and equal
protection of law.

220. It was the policy, practice, and/or custom of the defendant
CITY OF BOSTON to inadequately investigate citizens'
complaints of police misconduct and violations of law, and
acts of misconduct and violations of law instead were
tolerated and sanctioned by this defendant.

221. As a result of the above described policies, practices, and
customs, Boston Police officers, including defendants
PIEROWAY, RESIL, MICHAEL MOES 1-10, and MARY MOES 1-10,
believed that their actions would not be properly monitored
by the defendant CITY OF BOSTON, and that misconduct would
not be investigated or sanctioned, but would be tolerated
and ratified instead.

222. The above described policies, practices, and customs
demonstrated deliberate indifference on the part of the
policy makers of the defendant CITY OF BOSTON to the
constitutional rights of persons within the defendant CITY
OF BOSTON, especially persons of color, and were the cause
of the violations of BURRELL RAMSEY-WHITE's rights alleged
herein.

41

223. The defendant CITY OF BOSTON violated BURRELL RAMSEY-
WHITE's civil rights, protected by the constitutions and
laws of the United States and of the Commonwealth of
Massachusetts, by the intentional and deliberately
indifferent manner in which, pursuant to municipal policy,
practice, and/or custom, it failed and refused to properly
instruct, train, supervise, discipline, and command Boston
Police officers in knowledge and enforcement of federal and
Massachusetts criminal procedures, Boston Police Department
Rules and Procedures, nondiscriminatory and equal
enforcement of the law, and lawful methods of pursuit and
investigation, and, in particular, in the manner in which it
enabled, authorized, condoned, sanctioned, and ratified the
violations of BURRELL RAMSEY-WHITE's constitutional and
statutory rights to be free from unlawful searches and
seizures, be free from excessive force, be treated equally
and without discrimination under the law, enjoy due process
and equal protection of law, and enjoy, and find security in
other constitutional and statutory rights.

224. As a direct and proximate result of the defendant CITY OF
BOSTON's violation of BURRELL RAMSEY-WHITE's civil rights,
BURRELL RAMSEY-WHITE suffered the damages aforesaid,
warranting recovery pursuant to 42 U.S.C. §1983 and §1988.

**COUNT IX: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS BY DEFENDANTS PIEROWAY, RESIL, MICHAEL MOES 1-10, AND MARY MOES 1-10**

225. The plaintiff adopts, repeats, realleges, and incorporates by reference the allegations set forth in the preceding paragraphs as though they were fully set forth herein.

226. The violations of state and federal constitutional and statutory law committed by defendants PIEROWAY, RESIL, MICHAEL MOES 1-10, and MARY MOES 1-10, public servants who are employed to enforce the laws, acting on behalf of and with the authorization, approval, and ratification of the defendant CITY OF BOSTON, in the circumstances described herein, including without limitation, the illegal search and seizure of BURRELL RAMSEY-WHITE, the use of excessive and deadly force against BURRELL RAMSEY-WHITE, and the numerous violations of BURRELL RAMSEY-WHITE's constitutional and statutory rights to due process and equal protection of law, constitute extreme and outrageous conduct beyond all bounds of decency which is utterly intolerable in a civilized society.

227. As a direct and proximate result of the tortuous misconduct of defendants PIEROWAY, RESIL, MICHAEL MOES 1-10, and MARY MOES 1-10, BURRELL RAMSEY-WHITE suffered the damages aforesaid.

## **RELIEF SOUGHT**

WHEREFORE, the plaintiff respectfully demands judgment against the defendants, jointly and severally, in an amount to be determined by a jury to serve as compensatory damages, plus a multiple of that amount as permitted by statute and common law to serve as punitive and/or as multiple damages in addition to the compensatory damages, plus costs, interest and reasonable attorney's fees as allowed by law, plus such other and further relief as this Court deems equitable and just.

## **JURY TRIAL DEMAND**

THE PLAINTIFF RESPECTFULLY DEMANDS A TRIAL BY JURY ON ALL COUNTS OF HER COMPLAINT.

Respectfully submitted,
The Plaintiff,
By her Attorneys,


  /s/ *Mark F. Itzkowitz*
MARK F. ITZKOWITZ (BBO #248130)
175 Federal Street
Suite 1425
Boston, MA  02110-2287
(617) 695-1848
MFItzkowitz@hotmail.com


  /s/ *Sara Elizabeth Burns*
SARA ELIZABETH BURNS (BBO#692115)
LAW OFFICE OF SARA ELIZABETH BURNS
175 Federal Street
Suite 1425
Boston, MA  02110-2287
617-767-2710
sara@seburnslaw.com
April 25, 2016

44

## CERTIFICATE OF SERVICE

I, Sara Elizabeth Burns, counsel for the plaintiff, hereby certify that on this date, I made service of the within document by serving it electronically to registered ECF participants and/or by mailing/faxing/hand-delivering a copy of same to non-registered ECF participants as indicated on the Notice of Electronic Filing ("NEF"), upon the following counsel of record:

Lisa Skehill Maki, Senior Assistant Corporation Counsel
City of Boston Law Department
1 City Hall Plaza, Room 615
Boston, MA 02201.

/s/ *Sara Elizabeth Burns*
SARA ELIZABETH BURNS (BBO#692115)

Dated:  April 25, 2016